IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 19, 2005 Session

## BYRON LEWIS BLACK v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 88-S-1479      Walter J. Kurtz, Judge**

---

**No. M2004-01345-CCA-R3-PD - Filed October 19, 2005**

---

This appeal is before us following the reopening of Petitioner's post-conviction petition for the limited purpose of determining whether Petitioner is mentally retarded and thus ineligible for the death penalty pursuant to our supreme court's decision in Van Tran v. State, 66 S.W.3d 790 (Tenn. 2001) and the United States Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002).  The post-conviction court ultimately determined that Petitioner had failed to prove that he was mentally retarded and that the weight of the proof was that he was not mentally retarded. Accordingly, the court denied Petitioner's request for a new trial and denied and dismissed the petition for post-conviction relief.  In this appeal as of right, this court must determine the following issues: (1) whether Petitioner proved by a preponderance of the evidence that he is mentally retarded; (2) whether Tennessee Code Annotated section 39-13-203, as interpreted by the supreme court in Howell v. State, 151 S.W.3d 450 (Tenn. 2004), is constitutional in light of the principles outlined in Atkins v. Virginia; and  (3) whether the absence of mental retardation is an element of capital murder requiring the State to bear the burden of proof and requiring submission of the issue to a jury. After review of the record and the applicable law, we find no errors of law requiring reversal. Accordingly, we affirm the post-conviction court's denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Donald E. Dawson, Nashville, Tennessee, and Catherine Y. Brockenborough, Nashville, Tennessee, for the appellant, Byron Lewis Black.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Michelle Chapman McIntire, Assistant Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Byron Lewis Black was convicted in 1989 of three counts of first degree murder for the shooting deaths of his girlfriend, Angela Clay, and her two daughters, Latoya and Lakeisha Clay. A jury sentenced Petitioner to death for the murder of Lakeisha Clay and to two life sentences for the murders of Angela and Latoya Clay. Petitioner was also convicted of one count of burglary, for which he received a fifteen-year sentence. The Tennessee Supreme Court affirmed Petitioner's convictions and sentences on direct appeal. See State v. Black, 815 S.W.2d 166 (Tenn. 1991).

Petitioner subsequently filed a petition for post-conviction relief, which was denied by the trial court and affirmed by this court on appeal. See Byron Lewis Black v. State, No. 01C01-9709-CR-00422, 1999 Tenn. Crim. App. LEXIS 324 (Tenn. Crim. App., at Nashville, Apr. 8, 1999). The Tennessee Supreme Court denied Petitioner's application for permission to appeal this court's judgment, and the United States Supreme Court denied Petitioner's writ of certiorari. See Black v. Tennessee, 528 U.S. 1192, 120 S. Ct. 1249 (2000).

Subsequently, Petitioner filed a petition for writ of habeas corpus in the United States District Court, which was dismissed by the grant of summary judgment on December 11, 2001. Black v. Bell, 181 F. Supp. 832 (M.D. Tenn. 2001). Thereafter, Petitioner appealed to the United States Court of Appeals for the Sixth Circuit, and the Sixth Circuit Court of Appeals is currently holding its appeal in abeyance pending the disposition of this action.

On December 4, 2001, the Tennessee Supreme Court released its opinion in Van Tran v. State, 66 S.W.3d 790 (Tenn. 2001). This opinion held as a matter of first impression that the execution of a mentally retarded person violates the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution. The Van Tran Court further held that retroactive application of this new rule of law was warranted for cases on collateral review. Approximately six months later, on June 20, 2002, the United States Supreme Court held in Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002), that execution of mentally retarded persons was cruel and unusual punishment prohibited by the Eighth Amendment to the United States Constitution. In response to these two court opinions, Petitioner filed a motion to reopen his post-conviction petition on November 13, 2002, alleging that he was mentally retarded and thus ineligible for the sentence of death. The post-conviction court entered a preliminary order and found that Petitioner had made a sufficient showing for his petition to be reopened and held an evidentiary hearing.

### Post-Conviction Proceedings

During the post-conviction proceedings, Petitioner presented the testimony of four lay witnesses, three expert witnesses, the affidavit of an additional expert witness, and numerous exhibits. The State presented the testimony of two expert witnesses. Petitioner's experts all found that Petitioner met the criteria to be diagnosed as mentally retarded. The State's experts found that Petitioner did not meet the criteria to be diagnosed as mentally retarded.

The lay witnesses presented by Petitioner testified as to various aspects of Petitioner's social and educational history. Mary Smithson-Craighead first testified on behalf of Petitioner. Ms. Smithson-Craighead had been the coordinator of the Nashville Education Improvement Project (NEIP) while Petitioner attended elementary school at Carter-Lawrence Elementary School. Ms. Smithson-Craighead testified that the particular elementary school that Petitioner attended had received funding from the NEIP because an assessment by Metro Nashville Schools had determined that the students at Carter-Lawrence were not at grade level. Ms. Smithson-Craighead further testified that at the time Petitioner attended elementary school, the schools in Nashville were segregated and the school Petitioner attended was made up of minority students who were financially disadvantaged.

Ms. Smithson-Craighead testified as to the administration of achievement tests and intelligence quotient ("I.Q.") tests during her tenure at Carter-Lawrence. She explained that the achievement tests were given in a group setting and were administered by the teachers. I.Q. tests, however, were administered individually by someone from the district office. Ms. Smithson-Craighead testified that for the most part the standardized tests were given exactly by direction, but there had been an occasion where a teacher may have assisted a student on an exam. It was Ms. Smithson-Craighead's opinion that teachers can recognize students who are mentally retarded but that some students do slip through the cracks. She maintained, however, that teachers were sensitive to the possibility that a student might be mentally retarded. During her tenure at Carter-Lawrence, she had four students who were tested, removed from the school, and placed in another school in a classroom designated for the mentally retarded. Although Ms. Smithson-Craighead was the kindergarten through third grade NEIP coordinator at Carter-Lawrence while Petitioner attended school there, she never taught Petitioner.

Petitioner's sister, Melba Corley, testified that during Petitioner's childhood, their family lived in South Nashville in an asbestos-shingle siding home. She testified that during his childhood, Petitioner enjoyed playing outside and would at times get so dirty in the iron rust outside their home that he required two baths a day. She explained that Petitioner also adored their grandfather, who was the only other male in the home. She and her three sisters helped their mother and grandmother with the chores around the house, but Petitioner only had to help bring in the wood and coal from outside and keep his area of the room they slept in upstairs clean. Ms. Corley testified that she never considered her brother to be mentally retarded when they were growing up nor did anyone in her family ever discuss the possibility in her presence. She explained that he did require help with his homework and did not seem to enjoy reading like she did. He was able to keep himself clean and dress himself. She further testified that he had pride in himself. She related that she and her siblings received a yearly check-up by a doctor. Petitioner traveled with her and her husband to Colorado and California at different times. On those trips, Petitioner would help with the driving, but he was not very helpful with reading the maps. She did admit that her mother smoked and drank alcohol during pregnancy. She did not, however, testify as to the amount her mother drank while she was pregnant with Petitioner. Further, Ms. Corley could not recall Petitioner having an injury that would have caused brain damage.

Al Dennis, Petitioner's high school football coach, testified that he had coached Petitioner at Hume Fogg High School from 1972 through 1974. He explained that at the time Petitioner attended this school, it was a vocational school. Mr. Dennis testified that Petitioner was an outstanding defensive player. In fact, his senior year, he was third in tackles and assists on the team. Mr. Dennis also testified that during Petitioner's senior year, the team won the Division A, Class A state championship title. Although Petitioner was an outstanding defensive player, he was not a good offensive player. Coach Dennis explained that he ran a complicated offense on the team, and Petitioner simply could not learn or remember the plays. As a result, he would make mistakes. Therefore, he could only play on offense when the team had a significant lead. Coach Dennis testified that based on Petitioner's inability to remember and understand the plays, it was his belief that Petitioner had a lower intelligence. He also distinctly remembered that Petitioner smiled all the time, even when it was inappropriate to do so. Coach Dennis stated that even when Petitioner was being criticized, he would smile. According to the coach, Petitioner got along well with his teammates and was respectful of the coaches. He did not remember any problems Petitioner had at school that were brought to his attention by any of the teachers.

Richard Corley became acquainted with Petitioner when Petitioner's sister, Melba, married his brother. Mr. Corley worked at the insurance company Caroon and Black and assisted Petitioner in acquiring a job there. It was his belief that Petitioner worked at Caroon and Black from approximately 1974 until 1989. Mr. Corley testified that Petitioner basically served as a courier. Petitioner would make runs in a company van to the warehouse and bank and ordered supplies. When he went to the bank, he would deliver deposits, but he was not required to complete the deposit slips. He described Petitioner's job as simple and routine. When Petitioner was out, he and other employees could step in and do the job. Mr. Corley testified that he never considered that Petitioner was mentally retarded when he recommended him for the position at Caroon and Black. Mr. Corley further testified that Petitioner got along well with the other employees, was well-liked by the other employees, and seemed to be a good employee.

Dr. Albert Globus testified as an expert in psychiatry and neurology on behalf of Petitioner. Dr. Globus evaluated Petitioner in 2001 and again immediately preceding the post-conviction hearing. Dr. Globus concluded that Petitioner has a damaged brain. He explained that Petitioner had very serious abnormalities in his mental status examination. Specifically, Petitioner has a lack of cognitive ability and poor recent memory. Dr. Globus explained that Petitioner is very slow in his thinking and has a disconnect between what he is talking about and his mood, which always seems euphoric. Dr. Globus opined that Petitioner's poor short-term memory very likely places him in the mildly mentally retarded range.

Dr. Globus opined that there were several factors in Petitioner's early life that would cause some sort of mental ratio of delays in life and would result in mild or severe mental retardation in many people. Specifically, Dr. Globus identified the drinking of alcohol by Petitioner's mother during pregnancy as the most important factor. Dr. Globus also identified several other potential etiological factors including playing of football, possible lead poisoning, and possible inadequate

care at home. Dr. Globus testified that the playing of football is known to produce minor brain damage in people who "tackle with their heads." Petitioner reported to Dr. Globus that he had been hurt on several occasions in this fashion. Dr. Globus further explained that white paint had been made with a lead compound until it was outlawed because of its effects on development and the blood. Petitioner's sister had testified that there was white paint in Petitioner's childhood home and on the family crib, which had teeth marks on it. Dr. Globus testified that Petitioner had developed anemia during his first year or two of life, which could have been a result of lead exposure or poor nutrition or both.

Dr. Globus testified that brain imaging confirmed that Petitioner has brain damage. Dr. Globus had determined prior to the brain imaging that Petitioner's brain abnormalities exist in the frontal and temporal lobes. Dr. Globus testified that the brain imaging conducted by Dr. Robert Kessler confirmed such. Dr. Globus also testified that data gathered from Dr. Ruben Gur's assessment revealed that areas of Petitioner's brain are hypometabolic, which means that they process glucose at a rate below normal. Hypometabolism may indicate a site of a tumor, an epileptic fossa, a degeneration secondary to senile dementia or mental retardation. Dr. Globus also reviewed the findings of Dr. Daniel Grant and concluded that the psychological results are consistent with the other results. Finally, Dr. Globus concluded that Petitioner's mental retardation began before he was eighteen years old.

On cross-examination, Dr. Globus explained that he was initially hired by the federal public defender's office to determine if the state court had erred in finding Petitioner competent to stand trial. Dr. Globus admitted that although he has opined that one of the etiological factors in determining that Petitioner is mentally retarded is that he received brain damage from playing football, Petitioner was never evaluated by a medical professional because of a head injury received while playing football. Dr. Globus explained that many professional football players have cumulative minor injuries to the brain, which is probably also true of high school players. Dr. Globus also admitted that the etiological cause of mental retardation cannot be determined with certainty. Furthermore, it cannot be determined with certainty that the ingestion of alcohol during pregnancy will cause mental retardation.

Dr. Daniel Grant testified on behalf of Petitioner as an expert in neuropsychology and forensic psychology. In making his assessment, Dr. Grant interviewed Petitioner on two occasions, for a total of twelve to fourteen hours. During his testing of Petitioner, he saw no evidence of malingering, although he did not specifically test for it. Dr. Grant explained that he administered a battery of tests, which would in effect rule out malingering because it's difficult to perform poorly on the same concept areas on various tests. Dr. Grant testified that there are two major measures of adult intelligence: the Wechsler Adult Intelligence Scale -Third edition ("WAIS-III") and the Stanford-Binet Intelligence Test. In drawing his conclusion that Petitioner is mildly mentally retarded, he conducted a series of tests and applied the independent living scale.

Dr. Grant testified that when psychological tests are used to meet the criteria to diagnose retardation, the standard error of measurement must be considered. According to Dr. Grant, there

is generally a one to five point standard error of measurement with all intelligence tests. Dr. Grant explained that both the American Association of Mental Retardation ("AAMR") and the Diagnostic Statistical Manual for Psychiatry ("DSM") account for a standard error of measurement ("SEM") in intelligence testing. Accordingly, Dr. Grant testified that a person who scored a seventy-one on an I.Q. test may actually be classified as mentally retarded, because when adjusted by the SEM, the I.Q. score would fall within a range that extended both below and above seventy. Dr. Grant admitted that Petitioner received I.Q. scores while in school of eighty-three, ninety-two, and ninety-one, which are all above the range for mental retardation, even when adjusted by the standard error of measurement. Dr. Grant, however, noted that the I.Q. tests given to Petitioner while in school were administered in a group setting, and both the AAMR and the DSM recommend only individually administered tests. Furthermore, Dr. Grant explained that the results could be skewed depending on how they were scored. If the tests were scored by grade level rather than by age, Petitioner's scores would be skewed because he repeated second grade.

Dr. Grant also acknowledged that Petitioner scored a seventy-three on the WAIS intelligence test in 1993 and a seventy-six on the WAIS-R intelligence test in 1997. However, Dr. Grant opined that Petitioner's scores were inflated as the result of the Flynn Effect, which recognizes that people acquire more information and knowledge over time, which in turn requires that the I.Q. tests be renormed to reflect the gain of knowledge. Dr. Grant testified that Dr. Flynn, for whom the Flynn Effect is named, has done research that shows that for every three years after norms are collected for an intelligence test, the I.Q. is inflated by one point. Therefore, in nine years, the person should score three points higher on the I.Q. test. Dr. Grant opined that although Petitioner scored a seventy-three on the WAIS in 1993, the test was published in 1980; therefore, Petitioner's corrected I.Q. would be sixty-nine, after adjusting for the four point increase in the population's I.Q. between 1980 and 1993. Furthermore, Petitioner's corrected WAIS-R score would be seventy-one, rather than seventy-six, because according to the Flynn Effect there would be a five-point inflation.

Dr. Grant testified that Petitioner's results from the independent living scale revealed problems with managing money, managing a home, transportation, and health and safety. Dr. Grant further concluded that Petitioner met the criteria for deficits in adaptive behavior as set forth in both the DSM-IV and the AAMR. Dr. Grant testified that Petitioner never lived independently, never cooked, never cleaned the house, never did laundry, never participated in the care of his son, never contributed financially to his family, and never had a bank account. Dr. Grant further noted that even while he was married, he and his wife lived with his family. Dr. Grant found that based on these factors, Petitioner had deficits in adaptive behavior. Dr. Grant explained that Petitioner had support from his family that would enable him to blend into the general population. Although there was testimony that his family did not see him as retarded, Dr. Grant explained that this is not inconsistent with persons who fall into the mildly mentally retarded range.

Dr. Grant concluded that Petitioner's mental retardation existed prior to age eighteen. As evidence of this conclusion, Dr. Grant pointed to findings from Dr. Globus and Dr. Gur that there are abnormalities in his brain that can best be explained through things that happened to Petitioner early in life. He also highlighted Coach Dennis' testimony that Petitioner had difficulty following

plays. He noted that Petitioner repeated the second grade. Petitioner scored in the one percentile on a differential aptitude test administered in the ninth grade. Dr. Grant also pointed to the fact that Petitioner attended a very impoverished school.

The State presented two witnesses at the hearing: expert witnesses Eric Engum, Ph.D., J.D., and Susan Vaught, Ph.D. After extensive cross-examination, Eric Engum was qualified and permitted to testify as an expert in clinical and forensic psychology and neuropsychology. Dr. Engum opined that Petitioner did not meet the criteria to be diagnosed mentally retarded. Dr. Engum admitted initially in his testimony that he did not conduct his own testing of Petitioner. Instead, he relied upon the Petitioner's previous testing. Dr. Engum further explained that he did not conduct additional testing because he believed Petitioner was probably "test-wise" or "test-weary." Dr. Engum further opined that he believed Petitioner has "some sophistication in knowing how to present himself on the tests to make himself look impaired."

As to Petitioner's present I.Q., Dr. Engum testified that he relied upon Dr. Kenneth Anchor's testing who assessed Petitioner near the time of his trial. At the time of the testing conducted by Dr. Anchor, Petitioner scored an overall I.Q. of seventy-six, and Dr. Anchor indicated that he believed that despite the score of seventy-six, he suspected Petitioner actually performed at a much higher level in the community. Dr. Engum further explained that I.Q. tests tend to underestimate the intelligence of minorities. Dr. Engum also noted that Petitioner scored a seventy-six when tested by Pat Jaros, and he scored a seventy-three when tested by Dr. Gillian Blair in October 1993. Based upon his review of the testing of Petitioner, Dr. Engum testified that he could find no evidence that Petitioner had an I.Q. of seventy or less at the time he committed the crimes at issue.

In addition to determining that Petitioner did not have an I.Q. of seventy or less, Dr. Engum also opined that Petitioner failed to meet the second criterion for mental retardation: deficits in adaptive behavior. Dr. Engum testified that he assessed Petitioner's adaptive behavior according to the legal standard in Tennessee. He testified that it was his understanding that under the Tennessee standard, the issue is whether a person can adapt his behavior to the surrounding circumstances, which is a different standard than that set out in the DSM-IV. The question he believed he must answer was whether the Petitioner could function within his environment in terms of going about and doing the daily activities that everyone else does. Dr. Engum testified that he relied upon the testimony of individuals who testified during the mitigation phase of Petitioner's trial, and those individuals "commented very favorably upon him in terms of his ability to function within the environment." Dr. Engum also testified that during his childhood, Petitioner functioned like a child within his culture and community. Dr. Engum further noted that prior to age eighteen, there was no individualized assessment by school psychologists, no indication of significant problems with juvenile authorities, and no unusual behavioral problems. According to Dr. Engum, there simply were no major deficits in Petitioner's adaptive behavior. Dr. Engum also assessed Petitioner's adult years prior to committing the crimes for which he was convicted, and again he found no deficits in adaptive behavior. Furthermore, Dr. Engum opined that Petitioner did not meet the standard for deficits in adaptive behavior under the Tennessee standard or under the criteria set forth in the DSM-IV. Although Dr. Engum believed that Petitioner suffered from personality problems, delusional

problems, or psychological difficulties, those issues are separate and apart from the issue of whether Petitioner was mentally retarded.

On cross-examination, Dr. Engum admitted that Petitioner's grades were certainly not optimal and were highly inconsistent, but he determined that these problems may have resulted from motivational issues rather than mental retardation issues. Dr. Engum also acknowledged that the testing performed by Dr. Anchor was a screening test and was not as reliable as other testing performed. During cross-examination, Petitioner's counsel also brought out the fact that Dr. Anchor's license was revoked or suspended following Petitioner's trial because he had destroyed documents and test results. Dr. Engum reiterated that none of the experts who assessed Petitioner prior to 2001 made any identification of mental retardation. Petitioner argues on appeal that Dr. Engum's testimony and opinions are completely unreliable and should be given no consideration.

Dr. Susan Vaught also testified on behalf of the State as a clinical psychology and mental retardation expert. Dr. Vaught opined that Petitioner did not meet the criteria to be diagnosed as mentally retarded. As for the first criterion, Dr. Vaught explained that in recent testing Petitioner was "at or right at" criteria. She testified that because Petitioner's life was at stake, she wanted to give him the benefit of any doubt. She then explained that when he was first assessed Petitioner was above criteria, but he fell below criteria as time progressed. It was her opinion that there were a lot of alternative explanations for the decline other than long-standing mental retardation; therefore, she examined his history to determine onset.

Dr. Vaught testified that I.Q. tests have historically been biased against minorities. She explained that, therefore, if you have an African-American who tests in the seventies, the clinician must be very cautious with the interpretation, especially if mental retardation is being considered, because there is a bias in the test. Dr. Vaught also testified that she was aware of the Flynn Effect, but it was not the standard of practice to correct for it, in terms of looking at an I.Q. score. Dr. Vaught explained her concerns about the reliability of the recent I.Q. testing performed on Petitioner. She explained that the thumb print of Petitioner's scores is much more consistent with brain injury or an ongoing organic condition than it is for mental retardation. She went on to explain that with mental retardation, you generally see a global deficit of scores or an "elevator-down phenomenon" rather than some high scores and some very low scores. Dr. Vaught explained that she routinely performs assessments to determine whether a person qualifies for services in the State and that a part of her assessment must be whether the condition occurred prior to age eighteen and is, therefore, chronic or whether it is a fairly recent problem. Dr. Vaught testified that as for Petitioner, she believed his recent I.Q. scores were a result of a motivational problem or an organic problem. In any event, however, she testified she gave the "benefit of the doubt in [Petitioner's] direction."

Dr. Vaught testified that to determine whether a person has deficits in adaptive functioning, she would first determine whether the person could complete normal tasks of daily living that most people accomplish. Next, the health history and school history must be reviewed. Dr. Vaught explained that it should be determined whether the milestones were met on time. She reviews the school records and programs in the school to determine educational history. She also reviews job

history and marital history. As for Petitioner, Dr. Vaught had multiple sources of information, including but not limited to: medical records; school records; a taped interview with the police; testing performed by other clinicians; letters written by Petitioner; prior court testimony; and prison records. Dr. Vaught explained that in assessing deficits in adaptive functioning, she must consider three areas: conceptual, social, and practical.

Language, reading and writing, money concepts, and self-direction are the four basic areas examined to determine if there is a deficit in the conceptual area of adaptive functioning. Dr. Vaught found that Petitioner had age appropriate functioning within the conceptual category. Further, Dr. Vaught found Petitioner's social skills were intact and at or above the level suggested by current measures of intellectual functioning. Although she determined that Petitioner may have had some mental health issues, he did not have social deficits in adaptive functioning. Finally, Dr. Vaught concluded that Petitioner had no practical deficits in his activities of daily living.

Dr. Vaught further opined that there was no onset of mental retardation of Petitioner prior to age eighteen. Dr. Vaught explained that Petitioner's childhood history did not follow the pattern of a person with mild mental retardation who has escaped diagnosis. Dr. Vaught admitted that Petitioner did not excel in school; his grades were low to average. He did, however, test within the normal range on standardized I.Q. and achievement testing in elementary and junior high school. At one point, the testing may have indicated a learning disability in reading, but later testing showed he had progressed. Standardized testing in the ninth grade showed that he tested "far below age peers," but he continued on in school. Dr. Vaught also explained that during his high school years and in particular his ninth grade year, Petitioner suffered "multiple stressors," including the death of a teacher, football injury, and birth of his first child. In any event, Petitioner graduated with a regular diploma. Dr. Vaught testified that she had "rarely, if ever, seen a person with mild mental retardation make it through high school with no assistance like that, and they've managed to get a regular diploma." Dr. Vaught further pointed out that Petitioner played organized sports, was engaged in age appropriate activities such as dating, faced and managed a fairly high stress level, received his driver's license apparently without any vocational support, and kept employment without vocational support, training, or modifications.

Dr. Vaught candidly admitted that she neither personally interviewed nor tested Petitioner. She explained that she did neither for several reasons. One, she had been given voluminous records to review, and after her review of the records, she did not believe Petitioner met either the second or third criteria for mental retardation. Further, she saw a pattern of the scores on the I.Q. tests descending. She had also reviewed Dr. Jaros' report and believed that some organic results had occurred recently in Petitioner's life, and her findings would be skewed by such. It was also Dr. Vaught's opinion that as a result of the organic problems from which Petitioner was suffering, he would require clinical testing in the near future as a part of his diagnosis and treatment, and it was her belief that if she tested him, it would skew the results for the next clinician. Dr. Vaught further explained that she believed Petitioner had become savvy to the testing.

On cross-examination, Dr. Vaught again reiterated that clinicians are aware of the Flynn

Effect but that they do not adjust the scores based on it. Furthermore, she explained that she is very liberal in assessing a person to qualify for services as a result of mental retardation. She stated: "If I could possibly put somebody in for services that they need, I'm going to do it." She then testified that she had cautioned counsel for the State when he approached her for taking the case that if she could find that Petitioner is mentally retarded and keep him from being executed, she was going to do it. Dr. Vaught further admitted that Petitioner has a relatively impaired brain. Dr. Vaught referenced on several occasions in direct and cross-examination testimony her displeasure with Dr. Grant's comment that mental retardation was a mental illness. Dr. Vaught explained that mental retardation and mental illness are separate issues. Dr. Vaught explained that mental illness is a medical illness that affects a person's ability to think like a normal person from the standpoint of thought formation and mood. Mental retardation, however, is a developmental disability. It is something that a person is born with or acquires in childhood. She stated that mental retardation is a structural problem in the brain or "a very bad roll of the genetic dice." It has nothing, however, to do with mental illness.

Following the post-conviction hearing, the video deposition of Ruben Gur, an expert in neuropsychology, was taken and filed as part of the proof in the post-conviction proceedings. Dr. Gur concluded, after conducting an MRI and a PET scan, that Petitioner had brain damage. Dr. Gur testified that Petitioner's brain is damaged in the areas that control aggression and impulses, as well as Petitioner's ability to think about the future. Dr. Gur also testified that Petitioner had enlarged ventricles, which indicated that a lot of brain cells had died in the middle of Petitioner's brain. Dr. Gur explained that ventricular atrophy was a sign of several disorders and happens during gestation. He testified that large ventricles are a cardinal sign of schizophrenia but appear in mental retardation and in various forms of cerebral palsy or atrophy disorders. Dr. Gur testified that due to the scope of damage he found in Petitioner, he was looking for some major brain injury or a period of a coma, but neither of those are borne out in the record. Therefore, he found the most likely causes were fetal alcohol syndrome or a series of minor head injuries. He later admitted on cross-examination that he could not rule out other causes including adult alcohol and drug abuse. However, Dr. Gur testified that the results of Petitioner's PET scan also indicated brain damage resulting from fetal alcohol syndrome.

Dr. Gur explained that people with brain damage have "pockets of excellence" and "pockets of deficit," which explains why Petitioner may have performed well on some of the harder questions while missing some of the easier questions. Dr. Gur testified that the part of the brain that needed to be used to answer the easier questions may have been damaged. Accordingly, the fact that Petitioner correctly answered some of the harder questions while missing some of the easier questions is not an indication of malingering. Dr. Gur further testified that he did not test Petitioner for malingering because Petitioner appeared to be putting forth a lot of effort during the testing.

Dr. Gur concluded that Petitioner is mentally retarded. He estimated that Petitioner has an I.Q. of sixty. He also opined that Petitioner's test results indicated he had deficits in adaptive behavior. Ultimately, Dr. Gur admitted that he could not specify a date certain when Petitioner's brain damage occurred. However, Dr. Gur testified that to a reasonable degree of medical certainty,

Petitioner has serious brain damage and is mentally retarded.

Patti van Eys, a clinical psychologist at Vanderbilt University, submitted an affidavit regarding her evaluation of Petitioner. Dr. van Eys found Petitioner's I.Q. to be sixty-nine, based on the WAIS-II intelligence test. Dr. van Eys stated that she did not believe Petitioner was malingering. She also criticized the State's experts for failing to personally interview Petitioner in their assessments.

## Analysis

In this appeal, we must determine whether the trial court erred in finding that Petitioner was not mentally retarded and thus eligible for the death penalty. In 1990, the Tennessee Legislature enacted Tennessee Code Annotated section 39-13-203, which prohibited the execution of mentally retarded persons. In so doing, the legislature set forth the criteria for determining whether a person is mentally retarded and the burden of proof to be applied. See Tenn. Code Ann. § 39-13-203(a) and (c). This statute, however, had an effective date of July 1, 1990, and did not address its effect on defendants previously sentenced to death. In 2001, in response to a motion to reopen a post-conviction petition filed by a defendant sentenced to death prior to the effective date of Tennessee Code Annotated section 39-13-203, the supreme court determined that the statute does not have retroactive application. Van Tran v. State, 66 S.W.3d 790, 798 (Tenn. 2001). However, the Van Tran Court determined that pursuant to Article I, Section 16 of the Tennessee Constitution, it was constitutionally impermissible to execute a mentally retarded person. Van Tran, 66 S.W.3d at 800. Further, the Van Tran Court held that this newly recognized constitutional right warranted retroactive application to cases on collateral review. Id. at 811. Approximately six months after the Van Tran decision, the United States Supreme Court released an opinion holding that executing a mentally retarded person violates the United States Constitution. Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002).

Since releasing the Van Tran decision, our supreme court has had another occasion to address the Van Tran holding and its applicability. See Howell v. State, 151 S.W.3d 450 (Tenn. 2004). In Howell, the supreme court elaborated on the appropriate criteria to be applied in determining whether a petitioner is mentally retarded, set forth the standards to be applied by the post-conviction court, set forth the appropriate burdens of proof, and determined that a petitioner is not entitled to have a jury determine whether he is mentally retarded. Howell, 151 S.W.3d at 457-58, 463-65. Accordingly, both the Van Tran and Howell decisions will be of paramount importance in our determination of whether the post-conviction court erred.

In this appeal, Petitioner asserts that the trial court erred in determining that the evidence failed to prove that he satisfied the criteria to be deemed mentally retarded. Petitioner further asserts that Tennessee Code Annotated section 39-13-203 is unconstitutional as interpreted by the supreme court in Howell v. State. As a final argument on appeal, Petitioner contends that the supreme court erred in its holdings in Howell, that the petitioner bears the burden of proof, and that the determination of mental retardation is to be made by the court rather than a jury.

**Standard of Review**

The question of whether a defendant is mentally retarded and thus ineligible for the death penalty is a mixed question of law and fact. Accordingly, in this post-conviction appeal, we must review the post-conviction court's findings of fact de novo, with a presumption of correctness that is to be overcome only when the preponderance of the evidence is contrary to the court's findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). However, in reviewing the application of law to the facts, we must conduct a purely de novo review. Id. at 457. Thus, no presumption of correctness attaches to the post-conviction court's conclusions of law. Id. Bearing this in mind, we will first address the issue of whether Petitioner is mentally retarded and thus eligible for the death penalty.

**Petitioner's Eligibility for the Death Penalty**

As set forth supra, in determining whether Petitioner is mentally retarded and thus ineligible for the death penalty, this court must follow the holdings of our supreme court in Van Tran and Howell. Moreover, although Petitioner was tried and sentenced prior to the enactment of Tennessee Code Annotated section 39-13-203, this court must apply the criteria set forth in that statute in making our determination. See Van Tran, 66 S.W.2d at 812, which held that although Tennessee Code Annotated section 39-13-203 did not have retroactive application, the applicable criteria to be used by a court in making a determination of mental retardation are those set forth in the statute.

Tennessee Code Annotated section 39-13-203 sets forth the definition of mental retardation as follows:
(1) Significantly sub-average general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;
(2) Deficits in adaptive behavior; and
(3) The mental retardation must have been manifested during the developmental period or by eighteen (18) years of age.
Tenn. Code Ann. § 39-13-203(a) (2003). This definition sets forth a three-prong test, and all three of the prongs must be satisfied to establish mental retardation. Moreover, our supreme court clarified in Howell that the demarcation of an I.Q. score of seventy in the statute is a "bright-line cutoff" and must be met. Howell, 151 S.W.3d at 456, 458-59. "[T]he statute should not be interpreted to make allowance for any standard error of measurement or other circumstances whereby a person with an I.Q. above seventy could be considered mentally retarded." Id. at 456.

During the post-conviction proceedings, Petitioner presented the testimony of four lay witnesses, three expert witnesses, the affidavit of an additional expert witness, and numerous exhibits. The State presented the testimony of two expert witnesses. Petitioner's experts found that Petitioner met the criteria to be diagnosed as mentally retarded. Conversely, the State's experts found that Petitioner did not meet the criteria to be diagnosed as mentally retarded. In determining whether Petitioner meets the criteria to be deemed mentally retarded under Tennessee Code Annotated section 39-13-203, it will be necessary for the court to apply the criteria to the evidence

-12-

presented.

### Significantly Sub-average General Intellectual Functioning As Evidenced By A Functional Intelligence Quotient (I.Q.) of Seventy (70) or Below

The evidence in this record shows that Petitioner's intelligence has been tested no fewer than nine times. Petitioner's education records show that he was tested five times during his school years. However, the proof demonstrated that it was possible that one of the scores may have been placed on his record in error. Accordingly, the trial court did not rely upon that test in making its determination and neither will this court. In any event, while in the second grade in 1963, Petitioner scored eighty-three on the Lorge Thorndyke intelligence test. In 1964, Petitioner scored ninety-seven on an intelligence test. In 1967, Petitioner scored ninety-one on the Otis Beta intelligence test, and in 1969, Petitioner scored eighty-three on the Lorge Thorndyke intelligence test.

Petitioner's intelligence was next tested after his arrest for the murders of Angela Clay and her two daughters. Dr. Kenneth Anchor and Pat Jaros were hired by Petitioner's defense team in preparation for trial. Dr. Anchor and Pat Jaros determined that Petitioner had an I.Q. of seventy-six in 1988. Dr. Anchor determined that despite Petitioner's I.Q. of seventy-six, he suspected that Petitioner would perform at a much higher level in the community. Pat Jaros, a psychological examiner, testified at trial that Petitioner's I.Q. score of seventy-six was "just about right." Neither of Petitioner's experts found him to be mentally retarded. In 1993, Dr. Gillian Blair tested Petitioner's I.Q., and she found it to be seventy-three. During the post-conviction process, Dr. Pamela Auble also tested Petitioner. She determined his full-scale I.Q. was seventy-six. Dr. Auble found that Petitioner had neurological impairment, but she made no finding of mental retardation.

In 2001, Petitioner scored below seventy for the first time on an intelligence quotient test. Petitioner was tested by Dr. Patti van Eys, Ph.D., on the Wechsler Adult Intelligence Scale -Third edition ("WAIS-III"). On the WAIS-III, Petitioner scored sixty-nine. Dr. van Eys noted in her report that Petitioner's adult assessment results are consistently lower that his I.Q. estimates in childhood. She found this resulted from either later acute brain damage or a slower deteriorating process such as dementia or mental illness. She also noted that there was nothing in the records to substantiate acute brain damage. In 2001, Dr. Daniel Grant also evaluated Petitioner. Dr. Grant's testing showed that Petitioner scored fifty-seven on the Stanford-Binet Fourth edition test and sixty-four on the Comprehensive Test of Non-Verbal Intelligence ("CTONI").

Based on the above testing, Petitioner's experts at the reopened post-conviction proceedings determined that Petitioner had subaverage general intellectual functioning as evidenced by an I.Q. score of seventy or less. The experts based their conclusions on Petitioner's recent I.Q. scores. Petitioner's experts, Dr. Grant specifically, also concluded that Petitioner's previous adult I.Q. scores fell within the mentally retarded range, seventy or below, when adjusted by the standard error of measurement and the Flynn Effect. Dr. Grant explained that according to the Flynn Effect, people acquire more information and knowledge over time, which in turn requires that the I.Q. tests be renormed to reflect the gain of knowledge. According to Dr. Grant, the previous tests given to

Petitioner during his adulthood had not been renormed in years, which caused Petitioner's I.Q. score to be inflated. Dr. Grant also opined that the tests given to Petitioner during his childhood were not reliable measures of his I.Q. because they were administered in a group setting, and both the AAMR and the DSM recommend only individually administered tests to measure I.Q.

Neither of the State's expert witnesses administered their own I.Q. tests of Petitioner. Instead, they relied upon the previous testing. Eric Engum, one of the State's experts, testified that Petitioner failed to meet the first criteria for mental retardation because his I.Q. was not seventy or below. In reaching this conclusion, he relied upon the testing of Petitioner conducted by his experts at trial and the initial post-conviction proceeding. Based upon his review of the testing of Petitioner, Dr. Engum testified that he could find no evidence that Petitioner had an I.Q. of seventy or less at the time he committed the crimes at issue.

Dr. Susan Vaught, also a State expert, testified that Petitioner was "at or right at" criteria in recent testing. She explained that I.Q. tests have historically been biased against minorities. She explained that, therefore, if you have an African-American who tests in the seventies, the clinician must be very cautious with the interpretation, especially if mental retardation is being considered, because there is a bias in the test. Dr. Vaught testified that she was aware of the Flynn Effect, but it was not the standard of practice to correct for it, in terms of looking at an I.Q. score. She, therefore, conceded that Petitioner currently meets the first criterion for mental retardation.

Petitioner's test scores have decreased as he has aged. During his childhood, he tested with scores in the eighties and nineties. Prior to trial and his initial post-conviction proceedings, Petitioner's own experts testified that his I.Q. score was above seventy. Only recently has Petitioner's I.Q. score fallen below seventy. Petitioner's experts testified that his adult scores fell within the mentally retarded range when adjusted by the standard error of measurement and/or the Flynn Effect. However, our supreme court has held that the I.Q. score of seventy in Tennessee Code Annotated section 39-13-203 is a "bright-line cutoff" and must be met. Howell, 151 S.W.3d at 456, 458-59. As the Howell Court stated: "[T]he statute should not be interpreted to make allowance for any standard error of measurement or other circumstances whereby a person with an I.Q. above seventy could be considered mentally retarded." Id. at 456.

**Deficits in Adaptive Behavior**

The second criterion Petitioner must meet to prove mental retardation is that he has deficits in adaptive behavior. The Van Tran Court explained the second prong of the test as follows:

> The second part of the definition – adaptive functioning – "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socio-cultural background, and community setting." As discussed, a mentally retarded person will have significant limitations in at least two of the following basic skills: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and

safety." Influences on adaptive functioning may include the individual's "education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation."

Van Tran, 66 S.W.2d at 795 (quoting American Psychiatric Association, Diagnostic and Statistical Manual on Mental Disorders, 39, 40 (4th ed. 1994) (citations omitted)). In 1994, our supreme court construed the term deficits in adaptive behavior in its ordinary sense as "the inability of an individual to behave so as to adapt to surrounding circumstances." State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1994).

Both the lay witnesses and the experts testified as to how Petitioner adapted to his surrounding circumstances. The lay witnesses testified that Petitioner grew up in a large, close-knit family in a disadvantaged area of Nashville and attended a disadvantaged school. Petitioner repeated the second grade but appears to have functioned in the school system otherwise. He played football in high school, got along well with the other members of the team, and respected the coaches. None of the witnesses testified that he had any behavior problems in school or at home. After high school, he obtained employment at Caroon and Black Insurance Company where he ordered supplies, drove the company van, took deposits to the bank, ran errands, and worked in shipping and receiving. He was well liked by the other employees. Moreover, Petitioner purchased a car, apparently paid for the car himself, drove independently, and took great pride in keeping the car neat and clean. Petitioner married and had a child. Although Petitioner has always lived with his family, even during his five-year marriage, there was no testimony that he could not live independently. None of the lay witnesses ever considered Petitioner to be mentally retarded.

Dr. Grant tested Petitioner on the independent living scale and found Petitioner had problems with managing money, managing a home, transportation, and health and safety. Dr. Grant further concluded that Petitioner met the criteria for deficits in adaptive behavior as set forth in both the DSM-IV and the AAMR. As support for his conclusion, Dr. Grant pointed to the fact that Petitioner had never lived independently, cooked, cleaned the house, did laundry, participated in the care of his son, contributed financially to his family, or had a bank account. However, there is no proof in the record that Petitioner was unable to do these things.

State expert Eric Engum opined that Petitioner failed to meet the deficits in adaptive behavior criterion. Dr. Engum testified that he assessed Petitioner's adaptive behavior according to the definition set out by the supreme court in Smith. He testified that it was his understanding that under the Tennessee standard as defined by Smith, the issue is whether a person can adapt his behavior to the surrounding circumstances, which is a different standard than that set out in the DSM-IV. The question he believed he must answer was whether the Petitioner could function within his environment in terms of going about and doing the daily activities that everyone else does. Dr. Engum testified that he relied upon the testimony of individuals who testified during the mitigation phase of Petitioner's trial, and those individuals "commented very favorably upon him in terms of his ability to function within the environment." Dr. Engum also testified that during his childhood, Petitioner functioned like a child within his culture and community. Dr. Engum further noted that

prior to age eighteen, there was no individualized assessment by school psychologists, no indication of significant problems with juvenile authorities, and no unusual behavioral problems. According to Dr. Engum, there simply were no major deficits in Petitioner's adaptive behavior. Dr. Engum also assessed Petitioner's adult years prior to committing the crimes for which he was convicted and again found no deficits in adaptive behavior. Furthermore, Dr. Engum opined that Petitioner did not meet the standard for deficits in adaptive behavior under the Tennessee standard or under the criteria set forth in the DSM-IV. Although Dr. Engum believed that Petitioner suffered from personality problems, delusional problems, or psychological difficulties, those issues are separate and apart from the issue of whether Petitioner was mentally retarded.

State expert Dr. Susan Vaught testified that she routinely assesses adaptive behavior in individuals to determine if there are deficits. She explained that to determine whether a person has deficits in adaptive functioning, she first determines whether the person can complete normal tasks of daily living that most people accomplish. Next, she reviews the health history and school history. It is important to determine whether the milestones were met on time. She reviews the school records and programs in the school to determine educational history. She also reviews job and marital history. As for Petitioner, Dr. Vaught had multiple sources of information, including but not limited to: medical records; school records; taped interview with the police; testing performed by other clinicians; letters written by Petitioner; prior court testimony; and prison records. Dr. Vaught explained that in assessing deficits in adaptive functioning, she must consider three areas: conceptual, social, and practical.

Language, reading and writing, money concepts, and self-direction are the four basic areas examined to determine if there is a deficit in the conceptual area of adaptive functioning. Dr. Vaught found that Petitioner had age appropriate functioning within the conceptual category. Further, Dr. Vaught found Petitioner's social skills were intact and at or above the level suggested by current measures of intellectual functioning. Although she determined that Petitioner may have had some mental health issues, he did not have social deficits in adaptive functioning. Finally, Dr. Vaught concluded that Petitioner had no practical deficits in his activities of daily living. As a result, Dr. Vaught concluded that Petitioner did not have deficits in adaptive behavior.

**Manifestation of Mental Retardation During the Developmental Period**

Finally, to prove mental retardation, Petitioner must prove that his mental retardation manifested prior to age eighteen; in other words, he must show that he had an I.Q. below seventy and had deficits in adaptive behavior by age eighteen. The proof in the record simply does not support such a conclusion.

None of Petitioner's I.Q. scores were below seventy prior to age eighteen. Dr. Vaught noted that Petitioner's I.Q. scores have steadily decreased over the years. She explained that with mental retardation, you generally see a global deficit or suppression of all the scores rather than some high scores and some very low scores. Dr. Vaught explained that she routinely performs assessments to determine whether a person qualifies for services in the State, and a part of her assessment must be

-16-

whether the condition occurred prior to age eighteen and is, therefore, chronic or whether it is a fairly recent problem. Dr. Vaught testified that as for Petitioner, she believed his recent I.Q. scores were a result of a motivational problem or an organic problem. Dr. Vaught further testified that her findings were consistent with Pat Jaros, Petitioner's own expert, who testified at Petitioner's trial.

> As the United States Supreme Court has noted:
> [M]ental retardation is easier to diagnose than is mental illness. That general proposition should cause little surprise, for mental retardation is a developmental disability that becomes apparent before adulthood. . . . By the time the person reaches 18 years of age the documentation and other evidence of the condition have been accumulated for years. Mental illness, on the other hand, may be sudden and may not occur, or at least manifest itself, until adulthood.

Heller v. Doe, 509 U.S. 312, 321-22 (1993) (citations omitted).

Although Petitioner's experts maintain that his mental retardation is a result of his mother's drinking of alcohol while she was pregnant, the proof in the record simply does not support that Petitioner's I.Q. was below seventy or that Petitioner had deficits in his adaptive behavior prior to age eighteen. Accordingly, Petitioner cannot meet the third prong of the test for mental retardation. Because Petitioner failed to prove that he is mentally retarded by a preponderance of the evidence, he is not excluded from the sentence of death.

**Constitutionality of Tennessee Code Annotated Section 39-13-203**

Petitioner argues that the bright line test adopted in Howell that rejects an adjustment of an I.Q. score by the standard error of measurement excludes persons who are recognized as mentally retarded in the scientific community. Petitioner further argues that the approach adopted in Howell is in conflict with prevailing scientific practices. Petitioner contends that the prevailing scientific norm recognizes that an I.Q. score of seventy represents a range of sixty-two to seventy-eight, which accounts for the standard error of measurement.

Petitioner bases his argument on the Tennessee Supreme Court's 1997 decision that set the standard for evaluating scientific evidence, McDaniel v. CSX Transportation, 955 S.W.2d 257, 266 (Tenn. 1997). In McDaniel, the supreme court held that when determining the admissibility of scientific evidence under Tennessee Rules of Evidence 702 and 703, a trial court may consider a potential rate of error to determine if the evidence is reliable. McDaniel does not require courts to consider a potential rate of error when applying scientific evidence. Instead, McDaniel allows courts to consider a potential rate of error in determining whether scientific evidence is reliable and therefore admissible. Howell does not affect the admissibility of evidence. Indeed, evidence was presented by Petitioner's experts in this case as to the standard error of measurement.

The United States Supreme Court in Atkins left it to the states to develop an appropriate way to enforce the constitutional prohibition of executing mentally retarded persons. Atkins, 536 U.S. at 321. The Tennessee Legislature developed such a procedure in Tennessee Code Annotated section

39-13-203. <u>Atkins</u> did not require states to adopt a procedure that defined mental retardation using a standard error of measurement.

This issue is without merit.

**Submission of Issue of Mental Retardation to a Jury and Burden of Proof**

Finally, Petitioner contends that he has a fundamental right to life and that because the question of eligibility for the death penalty is a substantive element of capital murder, the state must bear the burden of proving that he is not mentally retarded and the issue must be submitted to a jury. Petitioner acknowledges that the Tennessee Supreme Court has rejected this argument but makes the argument in order to preserve it for later review. <u>See</u> <u>State v. Edwin Gomez</u>, 163 S.W.3d 632 (Tenn. 2005) ("Indeed, a defendant is never precluded from raising an issue simply because a prior decision has rejected it."). Petitioner is not entitled to relief on this issue.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the order of the post-conviction court denying post-conviction relief.

_____
JOHN EVERETT WILLIAMS, JUDGE